UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN BOLIN, GARY DOMKE, and
MICHAEL PROCASKEY,

      Plaintiffs,

v.

GENERAL MOTORS, LLC, a foreign
limited liability company,
UAW-GM CENTER FOR HUMAN
RESOURCES, a domestic nonprofit
Corporation, and INTERNATIONAL
UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRIUCULTURAL
IMPLEMENT WORKERS OF AMERICA
(UAW), a domestic nonprofit corporation,

      Defendants.

Case No. 16-cv-13686
Honorable Laurie J. Michelson
Magistrate Judge Elizabeth A. Stafford

---

**OPINION AND ORDER GRANTING MOTION TO DISMISS [16]**

---

      Plaintiffs John Bolin, Gary Domke, and Michael Procaskey are employees of Defendant General Motors ("GM") and members of Defendant International Union, United Automobile, Aerospace and Agricultural Workers of America ("UAW"). Plaintiffs all began their GM careers at plants, but in the 1990s, were "Special Assigned" to desirable positions at Defendant UAW-GM Center for Human Resources. Over ten years later, Plaintiffs were reassigned back to their home plants or new ones. They say that this decision was made due to their age. Therefore, they filed this lawsuit pursuant to federal and state age discrimination law. UAW has filed a motion to dismiss on both procedural and substantive grounds. The Court will grant the motion to dismiss.

# I. ALLEGATIONS OF THE AMENDED COMPLAINT

This case centers on Plaintiffs' job assignment to the UAW-GM Center for Human Resources ("CHR"). CHR is a joint program between GM and UAW. It "[p]rovides development, delivery, coordination, and administration of strategies and joint programs designed to educate and train both active and dislocated workers of General Motors . . . to enable employers to compete in a global marketplace." (R. 27, PID 269.) CHR has 80 to 100 employees who are paid through CHR joint funds. (*Id.* at PID 271.)

CHR employees report to the "Executive Committee," which consists of the GM Vice President of Labor Relations and the UAW Vice President of the UAW GM Department. (*Id.*) The "property, business, and affairs" of CHR are managed by the CHR's Board of Trustees, which consists of ten people: five GM-salaried employees appointed by the GM Vice President of Labor Relations, four UAW representatives appointed by the UAW Vice President of the UAW GM Department, and one UAW representative appointed by the International President of the UAW. (*Id.*)

The joint program that established the CHR also provides that GM employees can be "Special Assigned" as Joint Program Representatives to the CHR. (*Id.* at PID 272.) Such "Special Assigned" employees would "conduct[] the day-to-day duties necessary to provide the various development, delivery, coordination, and administration of strategies and joint programs[.]" (*Id.* at PID 273.) A GM employee Special Assigned to CHR would still receive GM wages and benefits, but would receive assignments from CHR. (*Id.* at PID 273.)

Plaintiffs began their GM careers at various plants, but eventually were Special Assigned to CHR. John Bolin began working at GM's Warren Tech Center in 1976, and was assigned to CHR in 1999. (*Id.* at PID 268.) Gary Domke began working at GM's Grand Blanc Tooling

Center in 1977, and was assigned to CHR in 1992. (*Id.*) Michael Procaskey began working at GM's Grand Blanc Tooling Center in 1979, and was assigned to CHR in 1992. (*Id.*) At the time of the events giving rise to the complaint, Plaintiffs were 60, 66, and 67, respectively. (*Id.*)

In September 2014, Cindy Estrada became a member of the CHR Executive Committee through her position as the Vice President of the UAW GM Department. (*Id.* at PID 272.) Shortly after Estrada started her position on the Executive Committee, she asked for a "bio" from each CHR employee, which was to include their start dates at GM and the CHR. (*Id.* at PID 275.) Meanwhile, Plaintiffs heard rumors of cutbacks at CHR, but were assured that their Special Assigned status was safe. (*Id.*)

However, in February 2015, administrative assistants to Estrada began meeting with Plaintiffs and other individuals over age 40 to inform them that their Special Assignment was ending effective March 1, 2015, and at that time, they would return to their home plants. (*Id.* at PID 275.) Estrada made this decision. (*Id.* at PID 276.) The administrative assistants advised Plaintiffs to retire at this time in order to avoid going back to the plants. (*Id.* at PID 276.) (Some of the Plaintiffs could not return to their home plants anyway because they had been closed. (*Id.* at PID 276.)) The administrative assistants told Plaintiffs that the decision was merely to cut down on employees and that it had nothing to do with performance. (*Id.* at PID 276.)

But Bolin and another Special Assigned, Tony Ochab (age 64) heard differently when they met with Administrative Assistant Kris Owen on February 19, 2015. Owen said that Estrada had stated, "we're not going to retrain short-timers in new work" regarding the decision-making process to end Plaintiffs' special assignment to CHR. (*Id.* at PID 277.)

The next week, Plaintiffs were advised to stop reporting to CHR and were placed on leave with pay until March 1, 2015. (*Id.* at PID 277.) At the end of that time, they were supposed

to either retire or report to their old plants (or new plants, if the old plants had closed). (*Id.*) If they chose to retire, they would receive leave until April 1, 2015, and retirement benefits thereafter. (*Id.*) At some point thereafter, Ochab and Bolin contacted the "Attorney General's office" to file a complaint against the UAW for age discrimination. (R. 27, PID 277.)

Each Plaintiff chose to return to a plant position, but they found that their pay had been reduced by as much as 50 percent, and working conditions and hours were different. (*Id.*) Plaintiffs also needed retraining in their plant positions. (*Id.* at PID 278.) Since April 1, 2015, Plaintiffs' and two other CHR positions were filled by individuals under age forty, with less training and experience than Plaintiffs. (*Id.* at PID 278.) And the individuals who filled these positions did not have any special training. (*Id.* at PID 279.)

Plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 4, 2015. (*Id.* at PID 279.) They filed a complaint in this Court on October 17, 2016. (R. 1.) After several Defendants filed motions to dismiss, Plaintiffs filed their amended complaint on January 25, 2017. (R. 27.) The amended complaint asserts two counts: Violation of the Age Discrimination in Employment Act (Count I) and Age Discrimination in Violation of the Elliott-Larsen Civil Rights Act (Count II). Defendant UAW filed its motion to dismiss based on the original complaint on December 21, 2016, and elected to rest on that motion along with supplemental briefing after the amended complaint was filed. (R. 16.) Briefing on the motion is complete and the Court heard argument on August 18, 2017.

## II.  LEGAL STANDARD

When a defendant moves to dismiss pursuant to Rule 12(b)(6), the plausibility standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), governs. Under that standard, a court first culls legal conclusions from the

complaint, leaving only factual allegations to be accepted as true. *Iqbal*, 556 U.S. at 679. The inquiry then becomes whether the remaining assertions of fact "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Although this plausibility threshold is more than a "sheer possibility that a defendant . . . acted unlawfully," it is not a "'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Whether a plaintiff has presented enough factual matter to "'nudg[e]'" his claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 683 (quoting *Twombly*, 550 U.S. at 570).

## III. ANALYSIS

UAW asserts three procedural arguments and one substantive argument for dismissal of Plaintiffs' two claims. UAW says Plaintiffs failed to exhaust internal union remedies as to both claims—the Court will not address this affirmative defense at this juncture in the case. UAW says Plaintiffs failed to name UAW in their EEOC charges and there is no identity-of-interest between the Defendants, and therefore their ADEA claims should be dismissed for failure to exhaust—the Court agrees only in part. UAW says that Plaintiffs' Elliott-Larsen Civil Rights Act claims are preempted by the Labor Management Relations Act—the Court disagrees. Finally, UAW says that Plaintiffs have not adequately pled that UAW is a joint employer under ELCRA—the Court agrees but will dismiss the claim without prejudice.

### A. UAW Constitution Exhaustion (Counts I and II)

UAW argues that Plaintiffs were required to exhaust the internal appeals procedure outlined in the UAW Constitution before filing suit in federal court. (R. 16, PID 93.)

A union employee who has a grievance against his union has two sets of internal remedies: "contractual remedies arising from a collective bargaining agreement and internal union constitutional remedies." *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012). In this case, like in *Chapman*,

> the contractual remedy is the grievance procedure established in the contract between the UAW and GM, a procedure created to settle disputes between an employee and GM. The internal union remedy is the appeal procedure established in the UAW Constitution, a procedure created to settle disputes between the UAW and the employees it represents in the workplace.

*Id.* Each remedy has "its own distinct exhaustion doctrine." *Id.* When, as here, an internal union appeals procedure exhaustion is at issue, "courts have discretion to decide whether to require exhaustion . . . ." *Clayton*, 451 U.S. at 689.

The Court will not delve further into the issue. Failure to exhaust union remedies is an affirmative defense. *Chapman*, 670 F.3d at 684. To be sure, "the prevailing rule is that a complaint showing on its face that relief is barred by an affirmative defense is properly subject to a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted." *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978). But this is not such a case. In considering a motion to dismiss, the Court is limited in the documents it can consider: "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)); Moore's Federal Practice Civil § 12.34 ("The courts may consider the following [on a motion to dismiss]: Documents attached to complaint, Undisputed documents alleged or referenced in complaint, [and] Public records.");

*see also Pfeil v. State St. Bank & Trust Co.*, 671 F.3d 585, 599 (6th Cir. 2012) ("Courts generally cannot grant motions to dismiss on the basis of an affirmative defense unless the plaintiff has anticipated the defense and explicitly addressed it in the pleadings.").

In this case, neither the amended complaint nor the documents the Court can properly consider on a motion to dismiss include the UAW Constitution. On its face, the amended complaint says nothing about the exhaustion of internal union remedies. Nor does the amended complaint refer to the UAW Constitution. So the Court does not find consideration of the document or the exhaustion argument appropriate on a motion to dismiss. *See O'Rourke v. Crosley*, 847 F. Supp. 1208, 1218 (D.N.J. 1994) (declining to address union remedies exhaustion at the motion-to-dismiss stage of a Labor Management Reporting and Disclosure Act because of outstanding "factual" determinations).

## B. EEOC Exhaustion (Count I)

UAW argues that Plaintiffs did not properly exhaust their federal age discrimination claim because the UAW is not named in Plaintiffs' EEOC charges. The Court agrees.

 "The rule in this circuit is that a party must be named in the EEOC charge before that party may be sued under Title VII unless there is a clear identity of interest between [the unnamed party] and a party named in the EEOC charge. . . ." *Knafel v. Pepsi-Cola Bottlers, Inc.*, 899 F.2d 1473, 1480–81 (6th Cir. 1990) (internal quotation marks removed, emphasis in original, citing cases). The naming requirement serves two purposes:

> First, the charge serves to notify the defendant of the discrimination claim alleged against him. By receiving notice of the claim, a defendant is able to preserve evidence that could be useful in his defense. Second, by naming the charged party and bringing him before the EEOC, that person is able to participate in conciliation efforts directed at securing voluntary compliance with the Act. Conciliation is a primary goal of Title VII and provides an avenue for compliance without the resort to the expense and inconvenience of litigation.

*Romain v. Kurek*, 836 F.2d 241, 245 (6th Cir. 1987).

Here, there is no formal charge signed by any of the named Plaintiffs against UAW— there are only charges naming GM and CHR, though UAW is mentioned in Plaintiffs' Intake Questionnaire. The issues raised in the briefing are (1) whether a complainant can "name" a party by mentioning the party in an intake questionnaire rather than a formal EEOC charge, and (2) if not, whether UAW shares an identity of interest with the named parties, GM and CHR. The Court addresses each question in turn.

Title VII does not directly define the term "charge." *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 112 (2002). However, implementing regulations and Supreme Court decisions offer the following insights:

> [I]n order for an EEOC filing to constitute a 'charge' that is necessary to exhaust an employee's administrative remedies under Title VII, the filing (1) must be 'verified'—that is, submitted under oath or penalty of perjury; (2) must contain information that is 'sufficiently precise to identify the parties, and to describe generally the action or practices complained of,'; and (3) . . . an 'objective observer' must believe that the filing 'taken as a whole' suggests that the employee 'requests the agency to activate its machinery and remedial processes[.]'

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 509 (6th Cir. 2011) (citations omitted). The Court also highlighted a "pertinent federal regulation: 'A charge may be amended to cure technical defects or omissions, including failure to verify the charge . . . .'" *Id.* (quoting 29 C.F.R. § 1601.12(b)). Thus, a claimant's second filing can "amend[]—and verif[y]— her first filing." *Id.* And therefore, the "content" of such filings can be taken together to determine what the claimant's charge said. *Id.* (examining both the first and second charge-related forms filed by plaintiff to determine whether her hostile work environment claim had been exhausted).

Plaintiffs cite several examples of district court decisions holding that certain *claims* were properly exhausted because they were mentioned in a claimant's intake questionnaire or other

documents submitted to the EEOC. For example, in *Harris-Berthea v. Babcock & Wilcox Tech. Servs. Y-12, LLC*, 2015 U.S. Dist. LEXIS 40197 (E.D. Tenn. Mar. 30, 2015), the defendant argued that plaintiff failed to exhaust her hostile work environment and disability discrimination claims because she failed to mention them in her verified EEOC charge. *Id.* at *20. Noting that "EEOC charges are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations of the EEOC charge," the district court examined three documents submitted by plaintiff to the EEOC: "(1) the EEOC 'Intake Questionnaire' form. . . signed by plaintiff; (2) the undated and unsigned document entitled 'Response for EEOC Document' (3) the EEOC 'Charge of Discrimination' form . . . signed by plaintiff 'under penalty of perjury.'" *Id.* at *16.

Applying *Williams*, the court found that the documents, taken together (1) were verified, (2) "identif[ied] defendant by name, along with individuals who allegedly were involved in discriminatory conduct," and (3) included statements such as "I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination that I described above." *Id.* at *15–16. Looking to all three of those documents, the district court found that (1) the hostile work environment claim was exhausted because "Plaintiff's 'Intake Questionnaire' lists the October 2009 drug testing incident and describes how she was treated differently than a white male 'member of medical staff' when she offered to take a late test," and (2) the ADA claim was exhausted because "[i]n the 'Intake Questionnaire,' plaintiff checked the box indicating that she has a disability, writing 'chronic anxiety/depression.' Additionally, in the 'Response for EEOC Document,' plaintiff indicates that she informed defendant's investigators of her alleged disability prior to her termination." *Id.* at *19–20.

Similarly, in *Ling v. Twp. of Richland*, No. 14-cv-14505, 2015 U.S. Dist. LEXIS 139957, at *20 (E.D. Mich. Oct. 14, 2015), the defendant argued failure to exhaust as to plaintiff's claim of ADA retaliation, citing the rule that "a[n ADA] plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." *See Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). But the district court noted that "[t]he rule is not a formalistic one but is one based on notice." *Ling*, 2015 U.S. Dist. LEXIS 139957, at *20. And the district court noted that "Ling's January 5, 2015 letter to the EEOC, his first deficient charge included a copy of his first complaint in this case. That complaint included Ling's claims in Counts II, III, & IV, all of which Defendants argue should be dismissed." *Id.* at *21. Given that defendant had received these documents, the fact that plaintiff did not check the retaliation box in his later, proper complaint was not fatal to his claim. *Id.*

Thus, both *Ling* and *Harris-Berthea* only reached the issue of notice of specific claims after first deciding that the defendant had notice that claims were being asserted at all. In other words, the EEOC charging documents made clear that the defendants had notice that a claim or claims were being asserted against them, and the question became the proper definition of those claims, which in turn was defined by looking past the EEOC charge to other documents such as the intake questionnaire.

But here, general notice of a claim being asserted at all is the key issue. That is, the Court is not being asked to define the proper scope of claims, given that defendant was on notice that claims were being asserted. Rather, the question is whether UAW had notice of claims being asserted at all. *See Ahanotu v. Mass. Tpk. Auth.*, 466 F. Supp. 2d 378, 391 (D. Mass. 2006) ("The key factual issue . . . is whether [defendant] received actual notice of the plaintiff's EEOC charge such that it had an opportunity for early conciliation."). In this case, there is no EEOC charge

against the UAW, no amended EEOC charge against the UAW, no address given for the UAW in either the EEOC intake questionnaire or formal charges, and no allegation in the amended complaint that the UAW had notice of any claims being brought against them by these Plaintiffs. *See Travers v. Corning Glass Works*, 76 F.R.D. 431, 433 (S.D.N.Y. 1977) ("This Court is well aware of the general policy that procedural technicalities are not to bar Title VII claims and that any ambiguities are to be resolved in favor of claimants. But the failure to charge [a defendant in the case] as a respondent if it was intended to hold him personally liable is not a procedural technicality but a matter of substance since if such were plaintiff's purpose, [that defendant] was entitled to notice under the statute.").

As courts in this circuit have recognized, "The filing of an administrative charge is not merely a formality to be rushed through so that an individual can quickly file his subsequent lawsuit. Rather, Congress intended the exhaustion requirement to serve the primary purposes of notice and conciliation." *White v. N. Mich. Reg'l Hosp.*, 698 F. Supp. 2d 950, 961–62 (W.D. Mich. 2010) (quoting *Chacko v. Patuxent Institution*, 429 F.3d 505, 510 (4th Cir. 2005)). While a close call, based on the face of the complaint and the documents the Court may properly review on a motion to dismiss, the Court is not convinced that UAW had notice that any claim was being asserted against it.

*Zeller v. Canadian Nat'l Railway Co.*, 666 F. App'x 517, 523 (6th Cir. 2016), which UAW cites, does not impact this conclusion. In *Zeller*, plaintiff brought sexual harassment claims against a number of corporate defendants which were either the owners of her employer, or shared office space with her employer. *Id.* at 523. Though plaintiff named all of these entities in her lawsuit, she failed to name one of these entities, Stellar, in the "EEOC Charge from which her cause of action depends." *Id.* at 524. Plaintiff did not dispute that Stellar was not named in

the charge, but argued that "Stellar [wa]s named as [her] employer along with 'CN Railroad' on the Intake Questionnaire[.]" *Id.* In a holding that the Sixth Circuit confined to "these facts," the Court concluded that the intake questionnaire could not serve to put Stellar on notice that a claim was being asserted against it: "the charge names only CN Railroad," and "Stellar employees are identified in [the intake questionnaire] only as witnesses with information about the allegations of a hostile work environment." *Id.* at 525. Thus, "To an objective observer, it would be clear that Plaintiff did not seek relief against Stellar and that Stellar was not named in the Charge for this reason." *Id. See also Cairns v. UBS Fin. Servs., Inc.*, No. CIV.A. 08-CV-00938L, 2008 WL 4852429, at *3-4 (D. Colo. Nov. 7, 2008) (holding that EEOC intake questionnaire and related summary did not constitute a charge of discrimination against a defendant for purposes of administrative exhaustion where Charge of Discrimination did not name defendant because intake questionnaire claimed but did not set forth an allegation of discrimination under ADEA against defendant).

In the present case, like in *Zeller*, the EEOC charges did not name UAW. (R. 16-11, PID 182–87.) But the intake questionnaire does have some minimal allegations suggesting that Plaintiffs though the UAW had engaged in discriminatory conduct, rather than merely witnessing it like in *Zeller*. (R. 37-2, PID 433, 437.) However, there is still the initial notice issue: nowhere is UAW's address listed, which would be required for a document to constitute a charge within the applicable regulations. Moreover, Defendant has identified one UAW employee—Susan Lewis—who actually filed a Charge of Discrimination with the EEOC against the UAW. (R. 39-4, PID 484.) But Plaintiffs did not. The Court finds that, based upon the materials that can be considered in a Rule 12(b)(6) motion, Plaintiffs' EEOC charge did not sufficiently name UAW.

The conclusion that UAW was not properly named is not the end of the analysis because "[i]n [*Romain v. Kurek*, 836 F.2d 241, 245 (6th Cir. 1987)], [the Sixth Circuit] adopted two tests for determining whether a party shares an identity of interest with another party" such that failing to name one party in an EEOC charge does not bar a subsequent suit for failure to exhaust. *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 411 (6th Cir. 1999).

Regarding the first test, "[c]ourts generally find an identity of interest where the unnamed party has been provided with adequate notice of the charge under circumstances which afford him an opportunity to participate in conciliation proceedings aimed at voluntary compliance." *Romain*, 836 F.2d at 245 (citing *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890 (7th Cir. 1981)).

> In the second test, the Court examines the following four factors:
>
> (1) Whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;
>
> (2) Whether, under the circumstances, the interests of a named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;
>
> (3) Whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party;
>
> (4) Whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Romain*, 836 F.2d at 246 (citing *Glus v. G.C. Murphy Co.*, 562 F.2d 880 (3rd Cir. 1977)).

Defendants have correctly stated both tests. However, the Sixth Circuit has cautioned that the named party requirement and its associated identity-of-interest tests are not always the proper subject of a motion to dismiss:

> Compliance with the named-party rule is part of a plaintiff's obligation to exhaust her administrative remedies with the EEOC before filing suit. 'Failure to exhaust

> administrative remedies . . . is an affirmative defense, and the defendant bears the burden of pleading and proving this failure.' We . . . are reluctant to dismiss complaints based on affirmative defenses at the pleading stage and before any discovery has been conducted. In fact, we only address affirmative defenses on Rule 12(b)(6) motions where 'the plaintiff's own allegations show that a defense exists that legally defeats the claim for relief.'

*Lockhart v. Holiday Inn Express Southwind*, 531 F. App'x 544, 547 (6th Cir. 2013) (citations omitted). Though this Court was able to properly address Plaintiff's argument that the intake questionnaire named UAW in this procedural posture, it cannot do the same as to Defendant's identity-of-interest argument. The information regarding UAW's interests relative to CHR, conciliation efforts, and prejudice does not come from the amended complaint or the documents central thereto. So the Court will not address the identity-in-interest argument at this time.

Accordingly, the Court will not dismiss Plaintiffs' ADEA claims for failure to exhaust EEOC remedies.

## C. Preemption (Count II)

UAW argues that Plaintiff's state-law age-discrimination claim is preempted by the Labor Management Relations Act ("LMRA"). (R. 16, PID 89.) The Court disagrees.

The LMRA provides,

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C.S. § 185(a). The Supreme Court has recognized that a collective-bargaining agreement "is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 (1960). For this reason, "[i]n defining the relationships created by such an agreement, the Court has applied an evolving federal common law grounded in national labor policy," *Bowen v. USPS*,

459 U.S. 212, 224–25 (1983), because "the application of state law . . . might lead to inconsistent results since there could be as many state-law principles as there are States[.]" *Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 413 (1988). Thus, "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).

The Supreme Court has also recognized, however, that "[t]he full scope of the preemptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis." *Id.* at 220. The Court has held this much: "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law" *Id.* (citing *Avco Corp. v. Aero Lodge 735*, 390 U.S. 557 (1968)).

"In light of these directives," the Sixth Circuit has developed a two-step approach for determining whether § 301 preemption applies:

> First, the district court must examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms. Second, the court must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law. If the right both is borne of state law and does not invoke contract interpretation, then there is no preemption. However, if neither or only one criterion is satisfied, section 301 preemption is warranted.

*DeCoe v. GMC*, 32 F.3d 212, 216 (6th Cir. 1994).

Plaintiffs argue that *DeCoe* does not apply in this context because of the Supreme Court's comment in *Lingle* that "[i]n the typical case a state tribunal could resolve either a discriminatory or retaliatory discharge claim without interpreting the 'just cause' language of a collective-bargaining agreement." 486 U.S. at 413. (R. 37, PID 417.)

In *Lingle*, an employee brought a retaliatory discharge claim against her employer, who allegedly terminated her after she requested worker's compensation. Her employer argued that the claim was preempted because the applicable collective bargaining agreement prohibited "wrongful discharge or discharge without just cause." *Lingle*, 486 U.S. at 402. The Court first noted the governing principle in the case: "if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is pre-empted and federal labor-law principles . . . must be employed to resolve the dispute." *Id.* at 405–06. The Court identified three "purely factual questions" that would resolve the retaliatory discharge claim:

> the plaintiff must set forth sufficient facts from which it can be inferred that (1) he was discharged or threatened with discharge and (2) the employer's motive in discharging or threatening to discharge him was to deter him from exercising his rights under the Act or to interfere with his exercise of those rights. . . . To defend against a retaliatory discharge claim, an employer must show that it had a nonretaliatory reason for the discharge[.]

*Id.* at 407. Given that each of those questions requires an inquiry into the conduct of the employer rather than any provision of the collective-bargaining agreement, the state-law remedy was "independent" of the agreement for pre-emption purposes: "resolution of the state-law claim [did] not require construing the collective-bargaining agreement." *Id.*

Though *Lingle* implies that discrimination claims are unlikely to be preempted because they turn on facts rather than a CBA provision, *DeCoe* explicitly cited *Lingle* in developing the two-factor test. *DeCoe*, 32 F.3d at 216. Moreover, it appears that the Sixth Circuit does apply the *DeCoe* test even in the context of discrimination claims. *See, e.g.*, *Paul v. Kaiser Found. Health Plan of Ohio*, 701 F.3d 514, 523 (6th Cir. 2012); *Paluda v. ThyssenKrupp Budd Co.*, 303 F. App'x 305, 309 (6th Cir. 2008). So the Court will apply *DeCoe* to determine whether Plaintiffs' ELCRA claim is preempted.

First, the Court examines whether proof of the state law claim requires interpretation of collective bargaining agreement terms. In order to prove their age-discrimination claim,[1] Plaintiffs must establish the following elements: "(1) [they are members] of a protected class; (2) [they were] qualified for [their] job[s]; (3) [they] suffered an adverse employment decision; and (4) [they were] replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *see Lytle v. Malady*, 579 N.W.2d 906, 914 (Mich. 1998) (describing the fourth element as requiring a showing that plaintiff "was discharged under circumstances that give rise to an inference of unlawful discrimination" but affirming that the test is "an adaptation" of *McDonnell-Douglas*).

UAW argues that these elements will require the Court to examine the following, each of which relates to the collective-bargaining agreement: (1) "UAW's alleged role as an 'employer' within the meaning of [the] Elliott-Larsen Act," (2) "the bargaining history and past practices associated" with the "UAW Vice President's authority to appoint and remove 'Special Assigned' employees," and (3) "Plaintiff's right to pursue their state law claim in the judicial forum, without first exhausting the contractual remedies, must be reviewed against the mandate of Paragraph 6a." (R. 16, PID 92.) That is to say, UAW argues that "each Plaintiffs' purported 'right' to retain their Special Assigned positions at the CHR is a product of the parties' collective bargaining agreement." (R. 39, PID 454.)

The Court does not doubt that the terms of the collective-bargaining agreement will have some relevance in determining the relationship between Plaintiffs and UAW. But "the central

---

[1] It appears that Plaintiffs would pursue the circumstantial route in proving their claims. (R. 37, PID 418 n.5) Without binding them to this representation should they later pursue the direct evidence route, the Court will examine the elements of the prima facie case in conducting the preemption analysis.

question is not whether some reference to the CBA must be made," it is "whether or not some element of the state cause of action *necessarily* requires an *interpretation* of the CBA." *Ivery v. Chrysler Corp.*, 31 F. App'x 841, 845 (6th Cir. 2002) (emphasis added). Further, where a disability discrimination claim is "only tangentially related to the terms of the CBA and is so related only because [the plaintiff's] relationship with [the employer] is governed by the CBA," the claim is not preempted. *Paul v. Kaiser Found. Health Plan of Ohio*, 701 F.3d 514, 522 (6th Cir. 2012). Indeed, in a case directly addressing an ELCRA claim, the Sixth Circuit held that "[t]he point is that Michigan employees have the right not to be discriminated against on the basis of age or handicap without regard to the collective bargaining agreement's language about an employee's rights." *O'Shea v. Detroit News*, 887 F.2d 683, 687 (6th Cir. 1989).

Though *O'Shea* preceded *DeCoe*, the Court finds its holding instructive as to the first step of the *DeCoe* test. In *O'Shea*, a reporter for the Detroit News alleged that he was transferred to the undesirable midnight police beat in order to force him to retire in violation of ELCRA's prohibition against age and disability discrimination (O'Shea was 57 and had health problems that prevented him from working the midnight shift). *Id.* at 684–85. The terms and conditions of his employment were governed by a collective-bargaining agreement. *Id.* at 685. Thus, defendant argued that resort to the agreement would be necessary to determine (1) whether O'Shea was in fact demoted, and (2) whether he should have filed a grievance pursuant to the agreement. *Id.* at 686. Citing *Lingle*, the Court held that such questions still did not justify preemption: "With respect to the discrimination claim, the right not to be discriminated against in employment decisions based on handicap or age is independent of the question of whether O'Shea was demoted or not." *Id.* at 687. Indeed, while O'Shea might argue that "the midnight shift was undesirable and that older or handicapped employees were assigned to it more often than

younger or non-handicapped ones," and defendant might argue that "it had the right to transfer its employees in order to improve its paper," neither of those questions impacted O'Shea's right against discrimination based on age or disability. *Id.*

UAW seeks to distinguish this case from a scenario like *O'Shea* by arguing that a union should be treated differently than an employer in the preemption context. (R. 39, PID 454 ("Plaintiffs' state law claim against GM, an employer, may not require the court to consult the GM-UAW National Agreement, but their state law claim against the UAW, a labor organization, most certainly requires interpretation of the collective bargaining agreement[.]").) But as the Supreme Court has commented,

> Clearly, § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law. In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.

*Lueck*, 471 U.S. at 212. Indeed, in *Ivery*, the Sixth Circuit held that an ELCRA race discrimination claim against both an employer and a union was not preempted: "Plaintiffs assert, in their amended complaint, that the Defendants (*both Chrysler and UAW*) had a duty pursuant to the Elliott-Larson Civil Rights Act and 'the statutes and common law of the State of Michigan . . .not to discriminate against the plaintiffs because of their race[.]'" 31 F. App'x at 846.

Similarly here, Plaintiffs argue that UAW was motivated by age discrimination when it took actions to transfer them out of their Special Assigned status. And to defend against the claim, the UAW may offer evidence that it was not motivated by age. This claim involves "purely factual questions pertain[ing] to the conduct of the employee and the conduct and motivation of the employer," *Lingle*, 486 U.S. at 407. And Defendant's supplemental brief

seemingly admits that any argument that UAW was not the employer or decisionmaker in this scenario would be resolved with reference to Michigan state law, not the collective bargaining agreement. (R. 30, PID 300 (citing the ELCRA standard for "joint control over the employer-employee relationship with respect to a plaintiff). Indeed, the Court will address this argument below. But it is not a reason to find that preemption applies here. *See Angel v. United Paperworkers Int'l Union Local 1967*, No. C-1-01-467, 2003 U.S. Dist. LEXIS 3668, at *44 n.6 (S.D. Ohio Mar. 6, 2003) (citing cases).

Accordingly, the Court finds that Plaintiffs' ELCRA age discrimination claim is not preempted.

### D. "Joint Employer" (Counts I and II)

UAW last argues that Plaintiffs' amended complaint makes clear that UAW is not their "employer" for the purpose of their claims under the ADEA and ELCRA. (R. 30, PID 298.) Both the ADEA and ELCRA impose liability on "employer[s]," "employment agenc[ies]," and "labor organization[s]." 29 U.S.C. § 623; Mich. Comp. Laws § 37.2201. Plaintiffs have chosen to pursue UAW as an "employer"—a joint employer. (R. 37, PID 423.) *See, e.g.*, *Swallows v. Barnes & Noble Book Stores*, 128 F.3d 990, 993 (6th Cir. 1997) ("Although a direct employment relationship provides the usual basis for liability under the ADEA . . . , courts have fashioned various doctrines by which a defendant that does not directly employ a plaintiff may still be considered an 'employer' under those statutes. . . . In another approach, courts consider whether one defendant has control over another company's employees sufficient to show that the two companies are acting as a 'joint employer' of those employees."). The "joint employer" standard under ADEA and ELCRA case law is similar in that both standards inquire as to the level of

control the alleged defendant has over the purported employee, but the Court will only address the ELCRA standard here because Plaintiffs' ADEA claims have already been dismissed.

Though the Court in *Swallows* did not analyze the "joint employer" doctrine in the ADEA context, the Sixth Circuit adopted the following "joint employer" doctrine for a Title VII sex discrimination claim:

> A conclusion that employers are 'joint' assumes that they are separate legal entities, but that they . . . handle certain aspects of their employer-employee relationship jointly. Where this doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer.

*Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 593 (6th Cir. 2009) (applying the standard as to Title VII's numerosity requirement).

The First Circuit has also provided guidance as to when it would be appropriate to find that two entities are "joint employers":

> The courts of appeals have emphasized a number of considerations relevant to the factual determination of whether an entity exercised sufficient control over employees to constitute a joint employer. The Seventh Circuit has noted the relevance of 'such factors as the supervision of the employees' day to day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, and issuance of operating instructions.' The Fifth Circuit, in finding a company was a joint employer, noted: '[The company had] the right to approve employees, control the number of employees, have an employee removed, inspect and approve work, pass on changes in pay and overtime allowed. In practice [the company] exercised its control, though in varying degrees.' [And the Second Circuit] . . . emphasiz[ed] five factors: (1) hiring and firing; (2) discipline; (3) pay, insurance and records; (4) supervision; and (5) participation in the collective bargaining process[.]

*Rivas v. Fed. de Asociaciones Pecuarias*, 929 F.2d 814, 820–21 (1st Cir. 1991).

In the ELCRA context, courts apply the economic reality test to determine whether a defendant was plaintiff's employer. "The factors to be considered in applying the economic

reality test are (1) control; (2) payment of wages; (3) hiring and firing; and (4) responsibility for the maintenance of discipline." *Ashker v. Ford Motor Co.*, 627 N.W.2d 1, 3 (2001) (citation omitted).

The amended complaint establishes that UAW had involvement in the CHR, but not whether it had any control over individual CHR employees. Plaintiffs allege that "the employees of CHR ultimately report to the Executive Committee of CHR," and the Executive Committee governs the "day-to-day functions" of CHR. (R. 27, PID 271.) In turn, the Executive Committee is comprised of the General Motors Vice President of Labor Relations and the UAW General Motors Department Vice President. (*Id.*) Yet Plaintiffs also allege that "[s]ince the date of their special assignment, Defendants CHR and GM jointly exercised some control over the work or working conditions of the Plaintiffs." (*Id.* at PID 273.) Plaintiffs further allege that "[w]hile the plaintiffs were special assigned . . . Defendant GM provided wages and benefits and Defendant CHR provided day-to-day instructions, supervision, evaluation and the ability to assign work." (*Id.*) The amended complaint is simply devoid of allegations regarding UAW's involvement in Plaintiffs' jobs at CHR.

The foregoing allegations may point to an analysis of whether GM and CHR were Plaintiffs' joint employers, but it does not suggest anything regarding UAW. Plaintiffs have an answer for that: they say that CHR's answer "admits . . . that special assigned individuals directly reported to the UAW while at CHR." (R. 32, PID 364.) But Plaintiffs made no such allegation and have cited no case law to support the proposition that a Court may consider the factual denials and admissions contained in a co-defendant's answer as part of a Rule 12(b)(6) analysis. Again, "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the

case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008). CHR's answer is technically an "item[] appearing in the record of the case[.]" *Id.* However, the Court is not convinced that allowing a plaintiff to both adopt admissions in an answer filed by one co-defendant and use those admissions against the other co-defendant, all via a response brief rather than a motion to amend the complaint, squares with the purposes of a motion to dismiss.

For one, UAW has objected to the use of CHR's answer. (R. 39, PID 449.) *See* Moore's Federal Practice Civil § 12.34 ("The courts may consider the following [on a motion to dismiss]: Documents attached to complaint, *Undisputed* documents alleged or referenced in complaint, [and] Public records."); *cf. Delawder v. Platinum Fin. Servs. Corp.*, 443 F. Supp. 2d 942, 946 (S.D. Ohio 2005) (considering a plaintiff's answer filed in a debt-collection action on a motion to dismiss a Fair Debt Collection Practices Act case based on the prior debt-collection lawsuit, where the answer was central to the plaintiff's claim and had been attached to defendant's motion to dismiss). And second, "the object of a motion under Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of the pleading." *Davis H. Elliott Co. v. Carribean Utilities Co.*, 513 F.2d 1176, 1183 (6th Cir. 1975). Therefore, "[i]t is one thing to set forth theories in a brief"—or adopt allegations in a response to a motion to dismiss—"it is quite another to make proper allegations in a complaint." *Pa. ex rel. Zimmerman v. Pepsico*, Inc., 836 F.2d 173, 181 (3d Cir. 1988); *see also Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). Plaintiffs, even with the benefit of UAW and CHR's motion to dismiss, did not include any allegation that Plaintiffs reported directly to UAW while working at CHR. The Court

finds it would be procedurally improper to allow Plaintiffs to supplement their complaint with allegations from a co-defendant's answer over the objection of the moving party, UAW.

And without CHR's answer, Plaintiffs have not plausibly pled that UAW was a joint employer pursuant to the federal joint employer standard or the Michigan economic reality test.[2] Accordingly, the ADEA and ELCRA claims against UAW will be dismissed for failure to state a claim.

## IV. CONCLUSION

For the foregoing reasons, UAW's motion to dismiss (R. 16) is GRANTED. Plaintiffs' ADEA and ELCRA claims against UAW will be DISMISSED WITHOUT PREJUDICE. Should Plaintiffs try to revive their claims, in order to facilitate efficient case management and without expressing any view as to the merits of the union remedies exhaustion defense, the Court will allow the early filing of a motion for summary judgment based on failure to exhaust union remedies by the UAW without precluding the UAW from filing a second summary-judgment motion on the merits if warranted.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: August 25, 2017                    U.S. DISTRICT JUDGE

---

[2] It appears that Plaintiffs anticipated this conclusion as they filed a motion for leave to file a second amended complaint after the hearing. (R. 41.) In the interests of efficiency, the Court issues this ruling and will address Plaintiffs' motion in due course.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 25, 2017.

s/Keisha Jackson
Case Manager